GERALD GORDON, as Receiver of the Rights and Assets of LOUIS PORTER, Respondent-Appellant, *v.* NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant-Respondent.

Second Department, July 23, 1971.

*Benjamin H. Siff* (*Thomas R. Newman* of counsel), for appellant-respondent.

*Greenspan, Aurnou & Davis* (*Joel Martin Aurnou* of counsel), for respondent-appellant.

*Aranow, Brodsky, Bohlinger, Benetar, Einhorn & Dann* (*Alfred J. Bohlinger, Anthony L. Tersigni* and *Peter R. Sterling* of counsel), for The National Association of Independent Insurers, *amicus curiae*.

GULOTTA, J. On November 28, 1961 one Louis Porter was operating his automobile on the Major Deegan Expressway when he collided with an automobile operated by John Rotsettis in which the latter's wife, Theoni Rotsettis, and one Emanuel Panteloglu were passengers. As a result of the accident both Rotsettises died and Panteloglu sustained severe injuries.

In a statement Porter gave to his insurance company, defendant Nationwide, he attributed the fault for the occurrence exclusively to Rotsettis in having suddenly cut in front of him from one lane to another.

Actions were commenced against Porter by estate representatives for both Rotsettises and the papers were turned over to Nationwide, whose policy of automobile liability insurance to Porter covered the period August 16, 1961 to August 16, 1962, with a limit of $20,000. Nationwide undertook the defense of the action at first, but on November 19, 1962 notified Porter that it was withdrawing from the case because its records indicated that the policy had been canceled, effective November 23, 1961, five days before the accident. Porter was also advised by Nationwide to retain his own counsel, but he did not and an inquest was taken against him resulting in a judgment for $179,462.50.

In the companion case of Panteloglu against Porter, which was commenced later, Nationwide refused to defend at all and that resulted in a default judgment against Porter for $35,000.

Originally there were four causes of action herein against defendant Nationwide. The first was by estate representatives of the Rotsettises to recover under section 167 of the Insurance Law; the second by estate representatives of the Rotsettises to recover $20,000 as damages for forestalling a timely claim against the Motor Vehicle Accident Indemnification Corporation; the third by the appellant Gordon, a receiver for Porter, to recover the excess judgment over policy limits, based on negligence; and the fourth by Gordon to recover a like sum based on breach of contract.

Summary judgment for $20,000 was granted to the Rotsettis' representatives on the first cause of action; and the second cause of action was dismissed on consent. The remaining third and fourth causes of action resulted in identical verdicts, based on special findings of a jury, in favor of plaintiff Gordon. Nationwide appeals from so much of the order-judgment entered as is in favor of Gordon in the sum of $259,058.87, on the jury's award of compensatory damages. Gordon cross-appeals from so much of the order-judgment as granted Nationwide's post-trial motion to vacate a further jury award of $300,000 in punitive damages in favor of Gordon.

Going to the heart of the basis for all this litigation, the evidence is both clear and overwhelming that Nationwide's refusal to defend Porter based upon an alleged policy cancellation was without foundation. It appears that Porter's policy had been financed by one J. Don Carra and the full year's premium had been paid in advance, pursuant to a written premium finance agreement. This agreement had purportedly been assigned to the Premier Credit Corporation by one Jack Durg, although the latter appears nowhere in the agreement as a party in interest. The notice which was relied upon by Nationwide as a cancellation notice was one sent by Premier to Porter. The sense of this notice was that by not making payment of his installments on time *he himself had elected to cancel his own policy* as of November 23, 1961 at 12:01 A.M. It may be further noted, in passing, that there was thus no default in the payment of premium so far as Nationwide was concerned, although Porter allegedly was in default on the finance agreement.

In our view there was no basis for Nationwide's reliance upon that notice as an effective cancellation of the policy for the following reasons: (1) An examination of the premium finance agreement discloses that Premier had no authority to treat a default by the policyholder as an election by him to cancel his own policy; (2) neither the premium finance agreement nor the

premium finance policy indorsement gives the lender a right or power of attorney to actually cancel the policy — they merely give the lender the right *to request* a cancellation by the insurance company; and (3) the so-called notice of cancellation was not served in conformity with section 576 of the Banking Law. As Justice NOLAN pointed out in granting summary judgment to the Rotsettis' representatives on the first cause of action (*Rotsettis* v. *Nationwide Mut. Ins. Co.*, 58 Misc 2d 667, affd. 31 A D 2d 722, mot. for lv. to app. den. 23 N Y 2d 646), even had there been proper authority to cancel, the notice was defective under section 576 of the Banking Law, which requires 13 full days when the notice of cancellation is sent by mail. He cited *Cannon* v. *Merchants Mut. Ins. Co.* (35 Misc 2d 625 [1962]) for that proposition. The instant notice was mailed on November 10, to take effect on the first minute of the 13th day, instead of the first minute of the 14th day, and therefore was short notice and ineffective for any purpose. The attorney for the personal representatives of the Rotsettises expressly called *Cannon* (*supra*) to Nationwide's attention well before the inquests against Porter.

In our opinion there is sufficient evidence in the record to support the jury's verdict on the fourth cause of action. That cause involves two distinct breaches of contract, the first being a breach of the express contract to defend. However, the ordinary damages for such a breach would be the reasonable cost of a defense, provided Porter had incurred such a cost. Since he did not, such damages would ordinarily be nil. Such a breach, standing alone, would not usually give rise to recovery of an excess judgment over policy limits. For that we need to turn to the second breach, viz., the breach of the implied obligation imposed on a carrier to deal with its assured fairly and in good faith.

The obligation of a carrier to defend and the obligation to deal fairly are interrelated in this case, because it was the breach of the former which made it impossible for the insurance company to perform the latter duty properly. In other words, this is not the more usual case where a carrier may become liable for an arbitrary refusal to settle within policy limits where there is no rational basis for such refusal. Here, had Nationwide remained in the case and developed Porter's defense, it might very well have successfully resisted a claim of bad faith. There is no rule that the failure to dispose of a case which has a huge exposure, and which can be settled for a small amount, in and of itself necessarily connotes bad faith.

Here, however, there was abundant evidence adduced at the trial from which the jury could and did find bad faith on the part of Nationwide. As has been demonstrated above, there was not the slightest legal basis for its claim of cancellation of the policy and for withdrawing from the defense of the action. Throughout the course of this litigation the attorney for the estates of the deceased persons went to extraordinary lengths to demonstrate to the insurance company how baseless and unjustified its actions were, but was treated in a most cavalier and arrogant fashion and met with a refusal and neglect to properly and fairly examine into the matter, although both the Rotsettis and Panteloglu claims could have been settled for the $20,000 policy limit even after they were reduced to judgment. Nationwide failed to inform its assured of the offers of settlement and there was no evidence that it even interviewed Porter's alleged eyewitness to the accident to evaluate whether a successful defense was feasible.

In sum, Nationwide deserted its assured for utterly frivolous reasons while pretending to him that the reasons were valid. It was from this totality of circumstances that Porter's damage arose and that is why Nationwide was properly held to answer for it in the fourth cause of action (*Henegan* v. *Merchants Mut. Ins. Co.*, 31 A D 2d 12; *New York Cons. R. R. Co.* v. *Massachusetts Bonding & Ins. Co.*, 193 App. Div. 438, affd. 233 N. Y. 547; *Brassil* v. *Maryland Cas. Co.*, 210 N. Y. 235; *Grand Union Co.* v. *General Acc. Fire & Life Assur. Corp.*, 254 App. Div. 274, affd. 279 N. Y. 638; see *Comunale* v. *Traders & Gen. Ins. Co.*, 50 Cal. 2d 654).

In our opinion there was also sufficient evidence to support the jury's verdict on the third cause of action. That cause was based on the theory of negligence, relying essentially on the same conduct which supported the fourth cause of action. Although Nationwide argues that the insured was contributorily negligent, Porter did not contribute to the haphazard and irresponsible conduct of Nationwide leading to the November 19, 1962 letters to Porter advising that the policy had been canceled prior to the 1961 accident.

It can readily be seen that Porter's alleged contributory negligence for the period *subsequent* to November 19, 1962 is essentially the same nonaction upon which Nationwide bases its claim that Porter failed to mitigate damages. In effect, the carrier seeks to be excused from liability because the basement-residing gas station attendant whom it insured did not procure

counsel to defend a double wrongful death suit and a personal injury action.

We are of the opinion that Nationwide's pleading, proofs and requests to charge did not properly or fairly present the issue of Porter's duty to minimize damages. In any event, damages would not be decreased without proof that it was feasible for Porter to have pursued the course urged, that the risk of doing so was minimal and that there was a virtual certainty that the results would be beneficial. The defaulter is in no position to cast this risk of substantial expenditures on the plaintiff. Since such risks arose because of the breach, they are to be borne by the defaulting party (22 Am. Jur. 2d, Damages, § 37; *Brown* v. *Weir,* 95 App. Div. 78; see *Western Cas. & Sur. Co.* v. *Herman,* 405 F. 2d 121, 124).

We conclude, therefore, that the evidence was insufficient to preclude or reduce recovery on the theory that Porter was contributorily negligent and could have and should have minimized his damages. Under the circumstances of this case, and in view of the language of Nationwide's requests to charge, we find there was no prejudicial error in the trial court's charge to the jury or in the denial of Nationwide's requests to charge.

The peripheral argument that Nationwide cannot be held for the full amount of the excess judgment because there was an absence of any showing that Porter was damaged in that amount is put to rest by the *Henegan* case (*supra*) which held that the insured is damaged upon the entry of judgment, irrespective of whether he pays it or has the ability to pay it. (See, also, *Dumas* v. *State Farm Mut. Auto. Ins. Co.,* 274 A. 2d 781 [Sup. Ct., N. H.].)

While we concur in the determination setting aside the award of punitive damages, we disagree with the rationale. Nationwide was guilty of far more than a good faith error in judgment as stated by the trial court. Indeed, were this not so, Nationwide would not be liable even for the compensatory award and that would also have to be set aside. More accurately, we would say that while there was a total absence of good faith on the part of Nationwide it did not rise to the level of proving a malicious desire to do the assured, Porter, an injury, as distinct from its desire to disentangle itself from a serious litigation, figuring perhaps in a cynical way that it had nothing to lose and at worst that it would only forfeit the policy limits. That being the case, there was an absence of the quasi-criminal conduct which is essential to support an award of punitive damages and it was

proper therefore to set it aside (*Huschle* v. *Battelle,* 33 A D 2d 1017, defendants' cross appeal dsmd. 27 N Y 2d 723; see *Cleghorn* v. *New York Cent. & Hudson Riv. R. R. Co.,* 56 N. Y. 44).

Accordingly, the order-judgment (one paper) should be affirmed, with costs to the plaintiff.

SHAPIRO, J. (dissenting). I disagree with the reasoning of the dissent by Mr. Justice BENJAMIN that an impecunious insured, or what he calls a *de facto* bankrupt, may be equated with an adjudicated bankrupt. An adjudicated bankrupt is no longer subject to payment of a judgment theretofore rendered against him, but that is not true of a judgment debtor who is merely unable to respond to a judgment. I can imagine any number of circumstances in which such a person can be legally harmed by having an outstanding judgment against him. For instance, if he should come into an inheritance it would be subject to the levy of the judgment; and, of course, if employed, his salary or wages would be subject to garnishee.

I am in agreement with the majority opinion of Mr. Justice GULOTTA that the failure of the defendant insurance company to settle the negligence actions did not, in and of itself, necessarily connote bad faith, but I do not agree with the conclusion, implicit in that opinion, that the damages flowing from the company's failure to defend in those actions, make it subject to payment of the judgments therein, which are in excess of the coverage of its policy, for *had there been no valid defense to the negligence actions the recoveries, presumably, would have been in the same amounts even if the insurer had complied with the terms of its contract and defended Porter, its insured.*

Under such circumstances, since Porter would have been held liable in the same amounts even if a defense had been interposed, the damages assessed against the insurance company by the judgment herein do not necessarily flow from the breach by the company of its contract to defend him (cf. *Rochester Lantern Co.* v. *Stiles & Parker Press Co.,* 135 N. Y. 209, 217). In my opinion the judgment should be reversed and a new trial granted to determine whether the excess judgments resulted from the breach, i.e., whether there was a valid defense which, as a result of the insurer's failure to defend, was not interposed. Furthermore, in this regard I believe there is an issue of fact as to whether Porter, by his conduct in failing to defend the negligence actions, after the insurance company withdrew its representation of him in one of the actions and refused to defend in the other action, contributed to the amount in which

the judgments were rendered, particularly in view of his contention that he had a good defense to the negligence suits.

Since those issues were not adequately presented to the jury, the judgment should be reversed and a new trial granted.

BENJAMIN, J. (dissenting). The defendant has paid $13,333.33 to the Rotsettis estates and does not dispute its liability to Panteloglu for $6,666.67. In my opinion, no judgment against the defendant in excess of the total of these amounts, $20,000, is here warranted; and the $259,058.87 judgment on the third and fourth causes of action, which is the subject of this appeal, consequently is unjustified, regardless of whether it be deemed based on tort or breach of contract. In either case the only allowable sum would be compensatory damages; and that, of course, would be measured by the true loss suffered by the insured, Louis Porter, as a result of the defendant's acts. While the third and fourth causes of action are by Gerald Gordon, as receiver of Porter's assets in supplementary proceedings, that does not change the rule, because Gordon's rights are derived through Porter and consequently cannot exceed them.

In this case, Porter's true loss is no more than the unpaid balance of the $20,000 coverage afforded by his policy. The record shows that Porter is a gas station attendant, living in a basement apartment in a low-cost area, and his car was an eight-year-old sedan worth at most several hundred dollars. When the defendant refused to defend the Rotsettis and Panteloglu actions against him, he did not attempt to secure private counsel and defend them himself, but instead let them go to inquest by default. The Rotsettis and Panteloglu counsel were unable to collect from Porter any part of the judgments obtained against him on the inquests and they had to resort to appointment of a receiver of his assets and this action against his insurer.

In view of these facts, it seems clear that Porter was a *de facto* bankrupt at the times of the accident and the entry of judgments against him. In light of his patent inability to pay any part of the Rotsettis and Panteloglu judgments, in light of the fact that a *de jure* adjudication of his bankruptcy would have formally wiped out his liability on those judgments, and in light of the fact that he apparently had no real credit standing in a business community which could have been impaired by the existence of the Rotsettis judgment against him, it seems plain to me that he did not suffer any real damage because of the judgments obtained against him by the Rotsettises and

Panteloglu. That being so, the true measure of the compensatory damages to which he (and, therefore, his receiver) is entitled in this action is not the amount of the Rotsettis and Panteloglu judgments, but only the unpaid balance of the defendant's $20,000 obligation under its policy (cf. *Harris* v. *Standard Acc. & Ins. Co.*, 297 F. 2d 627, cert. den. 369 U. S. 843). In a case like this, the mere entry of the judgments against the insured should not be considered proof of damage suffered by him. In my view, more is required — namely, proof that he has paid them, or can pay them, or, at the very least, that their existence has materially impaired his credit in his business or the community; and, absent such showing, the award against the insurer should be limited to the amount of its obligation under the policy (cf. *Harris, supra*); and here the insurer has already paid $13,333.33 and does not dispute its liability for the additional $6,666.67. The reasoning and result in *Harris* strike me as sound and I think we should follow it. I disagree with the reasoning and result in *Henegan* v. *Merchants Mut. Ins. Co.* (31 A D 2d 12 [which held that in a case like this the mere entry of a judgment against an insured established his damage]) and I think we should not follow it, because what it really does is impose punitive damages in the guise of compensatory damages; that we cannot and should not do.

Therefore, the judgment should be reversed and the third and fourth causes of action dismissed.

HOPKINS, Acting P. J., and CHRIST, J., concur with GULOTTA, J.; SHAPIRO, J., dissents and votes to reverse the judgment and grant a new trial, with a separate dissenting opinion; BENJAMIN, J., dissents and votes to reverse the judgment and dismiss the third and fourth causes of action, with a separate dissenting opinion.

Order-judgment (one paper) of the Supreme Court, Westchester County, entered April 10, 1970, affirmed, with costs to respondent-appellant.